James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

**[Additional Counsel in Signature Block]**

*Attorney for Plaintiffs and the Putative Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

SCOTT ADAIR, KENT HENDERSON, and TARRIS WALLACE, individually and on behalf of a class of similarly situated individuals,

*Plaintiffs,*

v.

AYLO FREESITES LTD., a foreign entity, AYLO HOLDINGS S.A.R.L., a foreign entity, 9219-1568 QUEBEC, INC., a foreign entity, AYLO USA INCORPORATED and AYLO GLOBAL ENTERTAINMENT, INC.

*Defendants.*

Case No. 2:25-cv-06351-WLH-KS

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Scott Adair, Kent Henderson, and Tarris Wallace ("Plaintiffs"), individually and on behalf of all other persons similarly situated as defined below, and based on personal knowledge where applicable, information and belief, and the investigation by counsel, allege the following against Aylo USA Incorporated, Aylo Global Entertainment, Inc., Aylo Freesites, Ltd., Aylo Holdings S.a.r.l. and 9219-1568 Quebec, Inc. (collectively, "Aylo" or "Defendants").

## INTRODUCTION

1. This class action lawsuit arises from Defendants' decision to enable and facilitate the unauthorized interception of users' most intimate online communications. When users visit Defendants' website, www.pornhub.com ("Pornhub" or the "Website"), they reasonably expect their sensitive sexual preferences, orientations, and viewing habits to remain confidential. Instead, Defendants have embedded multiple third-party tracking technologies on their website—including Google Analytics 4, etahub.com, adtng.com, camschat.net and hotfree123.com (collectively, the "Trackers")—that allow these third parties to intercept, collect, and exploit users' most private data without knowledge or consent. In doing so, Defendants have transformed private sexual exploration into a source of commercial surveillance and behavioral profiling.

2. The Defendants are part of the global "Aylo" (formerly known as "Mindgeek") pornography production and distribution conglomerate, with corporate roots in Canada and Cyprus. The defendants are involved in operating Pornhub, a pornography video-sharing website that is one of the world's largest adult entertainment websites. The site is ranked among the top 10 most browsed sites globally, with over 300 million visits and more than 2 billion pageviews each month in the United States alone. The Website allows its users to explore and view explicit content relating to their sexual identities, desires, and orientations.

3. Unbeknownst to users, however, each time a user visits the Pornhub

Website, Aylo enables the activation of the Trackers which surreptitiously intercept users' communications with the Website. These Trackers capture and transmit a host of highly sensitive and detailed personal information, including the titles of specific videos a user views, scene-level descriptors about those videos (including the names of performers and explicit sexual acts featured), search terms entered, and sexual orientation-based category selections. Through the Trackers, this data is disclosed to the third party operators of the Trackers, including Google and adult advertising networks, often in connection with persistent identifiers like cookies that make it possible to link online behavior to identifiable individuals.

4. Critically, this tracking occurs without any affirmative consent. Pornhub's policies are hidden at the bottom of its webpages in inconspicuous hyperlinks never presented for agreement to unregistered visitors. As a result, unregistered users engaging with the site's content are unaware that their most intimate preferences are being recorded, shared, and monetized.

5. By embedding and enabling these Trackers on the Website, Aylo has violated California Penal Code § 631, which prohibits not only direct interception of communications but also aiding, agreeing with, employing, or conspiring with any person to unlawfully intercept electronic communications. Aylo's conduct—intentionally embedding the Trackers and facilitating their operation for commercial purposes—renders it liable under California law.

6. In addition to claims under CIPA, Plaintiffs assert violations of the right to privacy enshrined in the California Constitution and bring a common law claim for intrusion upon seclusion. Each of these legal frameworks recognizes the uniquely sensitive nature of the data at issue and the serious intrusion caused by its unauthorized interception and disclosure

7. CIPA provides users whose privacy has been breached with the right to recover statutory damages of $5,000 per violation, plus attorney's fees and costs. Plaintiffs bring this claim to achieve redress on behalf of themselves and other

California citizens who were similarly injured by Aylo's unlawful conduct.

## PARTIES

8. Plaintiff Scott Adair is an individual residing in Oxnard, California who has accessed www.pornhub.com while logged into his Google account on one or more occasions during the relevant statutory period.

9. When Plaintiff Adair visited the website, he was not prompted to accept or review any Privacy Policy, Terms of Use, or cookie banner. No conspicuous notice was displayed, no consent mechanism was presented, and nothing on the screen alerted him that his communications and browsing behavior would be intercepted or disclosed. The purported Privacy Policy and Terms of Use were buried in inconspicuous hyperlinks, not placed in any location or format reasonably calculated to provide notice.

10. As a result, Plaintiff Adair was not on notice of any disclosures and did not consent to any interception or sharing of his data, let alone the most intimate details of his online activity, including his viewing behavior, search terms, video selections, sexual-orientation categories, and device identifiers.

11. Plaintiff Kent Henderson is an individual residing in Redondo Beach, California and who has accessed www.pornhub.com on one or more occasions during the relevant statutory period.

12. When Plaintiff Henderson visited the website, he was not prompted to accept or review any Privacy Policy, Terms of Use, or cookie banner. No conspicuous notice was displayed, no consent mechanism was presented, and nothing on the screen alerted him that his communications and browsing behavior would be intercepted or disclosed. The purported Privacy Policy and Terms of Use were buried in inconspicuous hyperlinks, not placed in any location or format reasonably calculated to provide notice.

13. As a result, Plaintiff Henderson was not on notice of any disclosures and did not consent to any interception or sharing of his data, let alone the most

intimate details of his online activity, including his viewing behavior, search terms, video selections, sexual-orientation categories, and device identifiers.

14. Plaintiff Tarris Wallace is an individual residing in Fairfield, California and who has accessed www.pornhub.com on one or more occasions during the relevant statutory period.

15. When Plaintiff Wallace visited the website, he was not prompted to accept or review any Privacy Policy, Terms of Use, or cookie banner. No conspicuous notice was displayed, no consent mechanism was presented, and nothing on the screen alerted him that his communications and browsing behavior would be intercepted or disclosed. The purported Privacy Policy and Terms of Use were buried in inconspicuous hyperlinks, not placed in any location or format reasonably calculated to provide notice.

16. As a result, Plaintiff Wallace was not on notice of any disclosures and did not consent to any interception or sharing of his data, let alone the most intimate details of his online activity, including his viewing behavior, search terms, video selections, sexual-orientation categories, and device identifiers.

17. Defendant Aylo Freesites, Ltd. is a private company organized under the laws of the Republic of Cyprus. According to the August 18, 2025 Declaration of Andreas Alikiviades Andereou In Support of Defendants' Motion To Dismiss Complaint ("Andereou Declaration"), "Pornhub is operated by Aylo Freesites Ltd." (Dkt 19-2, Andereou Declaration, ¶4).

18. Defendant Aylo Holdings S.a.r.l. is a limited liability company, incorporated under the laws of Luxembourg, and is the ultimate parent corporation of Aylo Freesites Ltd, Aylo USA Incorporated, and Aylo Global Entertainment, Inc.

19. Defendant 9219-1568 Quebec Inc. is a corporation organized and operating under the laws of the Province of Quebec, Canada.

20. Defendant Aylo USA Incorporated is a limited liability company, incorporated in Delaware with its principal place of business at 610 Brazos St, Suite

500 Austin, Texas 78701. Defendant Aylo USA Incorporated is also registered in California as an out-of-state corporation in good standing.

21. Defendant Aylo Global Entertainment, Inc. is a limited liability company, incorporated in Delaware with its principal place of business at 610 Brazos St, Suite 500 Austin, Texas 78701.

22. Defendants are alter egos operating as a single enterprise that own and operate Pornhub. Indeed, there is evidence that before the defendants were rebranded as Aylo, they operated together as the owners and operators of Pornhub. In a December 21, 2023 Deferred Prosecution Agreement Aylo Holdings S.a.r.l. admitted that for a period of 11 years until 2020 "MindGeek was a global, privately held group of entities (including MindGeek USA, Inc., MG Freesites Ltd., and MindGeek S.a.r.l.), the business of which included the maintenance and operation of websites that enabled third parties to post and distribute adult videos. MindGeek owned and operated numerous pornographic websites and brands including Pornhub.com ("Pornhub")." Aylo Holdings S.a.r.l admitted that "the facts described in the Statement of Facts are true and accurate." A true and correct copy of the Deferred Prosecution Agreement, filed December 21, 2023, in *United States v. Aylo Holdings S.à r.l.*, No. 1:23-cr-00463 (E.D.N.Y.), is attached hereto as Exhibit A.

23. Upon information and belief, the defendants have common ownership with Aylo Holdings S.a.r.l. acting as the ultimate parent corporation of Aylo Freesites Ltd, Aylo USA Incorporated, and 9219-1568 Quebec Inc. In addition, upon information and belief the different entities share the same directors. A May 23, 2022 Declaration by Andreas Alikiviades Andereou filed in a different proceeding ("May 23, 2022 Declaration") indicates that the sole Director of MindGeek USA Incorporated was Andrew Link, and that the sole director of MindGeek Global Entertainment, Inc. was Andrew Link. Furthermore, Mr. Alikiviades admitted that he was on the board of directors of 9219-1568 Quebec Inc., MindGeek S.a.r.l, and MG Freesites. A true and correct copy of the Declaration of Andreas Alkiviades Andreou

in Support of the MindGeek Defendants' Motion to Dismiss, filed May 23, 2022, in *Serena Fleites v. MindGeek S.à r.l.*, No. 2:21-cv-04920-CJC-ADS (C.D. Cal.), is attached hereto as Exhibit B.

24. Upon information and belief, this complex web of corporate entities with concentrated ownership and management operate as a single enterprise in their ownership and operation of Pornhub. Indeed, according to the Andreou Declaration, "Aylo Global Entertainment. Inc. also provides limited support services to other Aylo corporate entities. Currently, two of its employees have responsibility concerning the content on Aylosites. (Dkt 19-2, Andreou Declaration, ¶7). And, according to the May 23, 2022 Declaration, MindGeek Freesites Ltd. "relies upon the service of other entities, including … 9219-1568 Quebec Inc."

25. Taken together, the foregoing allegations demonstrate how Defendants Aylo Holdings S.a.r.l., Aylo Freesites Ltd., Aylo USA Incorporated, Aylo Global Entertainment, Inc., and 9219-1568 Quebec Inc. are not independent entities, but rather interrelated components of a single enterprise that owns, controls, and operates Pornhub.

26. Upon information and belief, Defendants are a complex and shifting web of affiliated corporations that restructure themselves in ways aimed to frustrate litigation. Treating these entities separately would result in inequity by allowing them to evade responsibility through corporate formalities.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction over this action under Article VI, Section 10 of the California Constitution; CIPA, Cal. Penal Code § 638.51; and Cal. Code Civ. Proc § 410.10. This action is brought as a class action on behalf of Plaintiffs and Class Members under Cal. Code Civ. Proc. § 382.

28. This Court has personal jurisdiction over the parties because Defendants have sufficient minimum contacts with this State in that they operate and market the Website to and for California residents throughout the State. Defendants target

advertisements to consumers in California and a substantial share of the unique, U.S.-based visitors to the Website reside in California. Defendants also host, sponsor, and attend regular marketing events in California for purposes of promoting the Website.

29. Venue is proper in this Court because Code of Civil Procedure §§ 395 and 395.5 and case law interpreting those sections provide that if a foreign business entity fails to designate with the office of the California Secretary of State a principal place of business in California, it is subject to being sued in any county that a plaintiff desires. On information and belief, Defendants are foreign business entities and, as of the date this Complaint was filed, had failed to designate with the office of the California Secretary of State a principal place of business in California. Defendants' registered agent for service of process in California is located in Glendale, CA.

## FACTUAL ALLEGATIONS COMMON TO THE CLASS

### A. Website Tracking Technology

30. When a user visits a website, their web browser must communicate with the website's server to load the page content. This communication happens through an "HTTP request" or "GET" request sent from the user's browser to the website's server. The server then responds with an "HTTP response" containing instructions for displaying the webpage, including what text should appear and where, what images should load, and what music should play. A general diagram of the process is shown below:



31. During this process, the server's HTTP response process may also cause trackers and tracking software to be installed on a user's browser. The trackers and tracking software are invisible pieces of code that can cause the browser to send information to a third party, including the user's IP address and details about the user's device (make, model, operating system), location information, browser information, and other persistent identifiers.

32. If the same third-party tracker or tracking software is present across multiple websites, it can build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' browsing habits, preferences, and behaviors across the internet.

33. Businesses often incorporate these third-party tracking technologies into their websites' codes for various purposes, including for collecting and analyzing user data; monitoring website interactions; enabling targeted advertising; measuring advertising effectiveness; and generating revenue through data sharing and targeted advertising.

34. In order to incorporate third-party tracking technologies into their websites and obtain these benefits, the owner of a website like Pornhub will often add or embed a small piece of JavaScript measurement code corresponding to a tracker into each page of its site. Once implemented, the code loads automatically and immediately whenever a user visits a page containing the code. The tracking codes execute in the background without any visible indication to the user, making it completely invisible to ordinary website visitors. Only users with technical knowledge who deliberately inspect the page's source code or use specialized browser tools might detect the presence of these tracking mechanisms and the interception of their communications by third parties. The surreptitious nature of the tracker means that users typically have no idea that their electronic communications are being intercepted.

35. Another way that trackers, tracking codes and tracking software

typically operate is through the installation of cookies on users' browsers. A cookie is a small text file containing data that a website's server creates and transmits to a web browser, which then stores the file on the user's device. When a user revisits a website, the tracker and tracking software can access the information stored in the cookie, allowing it to recognize the user, thereby helping the tracker or tracking software to continue building their profile. These cookies can persist from a few days to several years, enabling long-term tracking and profiling.

36. When the same third-party tracker or tracking software appears across multiple websites, it can use the data it collects to build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' browsing habits, preferences, and behaviors across the internet.

37. The installation and operation of trackers and their related cookies occurs automatically and invisibly when users visit websites. Users are typically unaware that their data is being collected and transmitted to third parties or that information is being stored on their device through cookies, as the processes happen in the background without any visible indication.

**B. Aylo Has Installed Trackers on Pornhub that Intercept Users' Communications**

38. Aylo has embedded the various third-party Trackers on the Pornhub Website which collect and transmit users' private and highly sensitive information without their knowledge or consent, including alongside persistent cookie identifies that can be linked to a person's identity and browser information.

*i. Google Analytics*

39. In addition to the trackers described above, Aylo has also embedded Google Analytics 4, a web tracking platform owned by Google, into the Pornhub Website. Google Analytics operates as a third-party tracking script that intercepts and transmits detailed user interactions to Google for advertising, profiling, and marketing optimization purposes.

40. Google markets Google Analytics 4 as a platform that offers "a complete understanding of your customers across devices and platforms" to "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data."[1] Google Analytics 4 collects data from a website or application to create shareable reports that provide insights into a website, and is designed to work together with other Google solutions to provide a company with a complete understanding of its marketing efforts and enhance performance.

41. Like the Adtng and Etahub trackers, the owner of a website like Pornhub can install Google Analytics 4 on their website by adding or embedding a small piece of JavaScript measurement code into each page of its site. When users access Pornhub, Google Analytics 4 executes automatically and invisibly in the user's browser. Aylo has installed Google Analytics 4 on the Pornhub Website.

42. Once activated, the Google Analytics 4 tracker intercepts, reads and analyzes various data points about user communications with a website, known as "events." These events include page views, links the user has clicked, form submissions, video plays, file downloads, and custom events defined by the website owner. The Google Analytics 4 tracker intercepts these events, transmits them to Google's servers in real time, as they occur.

43. On the Pornhub Website, the events which Google Analytics 4 intercepts, reads and analyzes include a range of highly sensitive and identifying information, including (1) specific video titles a user has selected and played; (2) any sexual orientation categories navigated (e.g., transgender, gay, bisexual); (3) explicit and detailed scene-specific attributes of the videos (such as the presence of named pornographic performers, the production type like "amateur," "homemade" or

---

[1] *Analytics*, Google Marketing Platform, https://marketingplatform.google.com/about/analytics/ (last visited May 30, 2025).

"doggy style," or whether the video was made in a specific country such as "Japan"); (4) any search terms entered by the user into the Pornhub Website search bar, including even sensitive queries like "Asian teen girl" or "young black teens" (the Pornhub site presents users with a "warning" notification for these terms; but even if a user ultimately chooses not to proceed with viewing the search results, the search terms are still shared with Google); and (5) details about products viewed or purchased on the Website's online shop, including item categories, names, and price.

44. The image below is a screenshot showing the information that is immediately transmitted to Google through the Google Analytics 4 tracker when a user visits the Pornhub home page for the first time (www.pornhub.com). The information includes the fact that the user visited the site "www.pornhub.com," and that the user is browsing pornography relating to the "straight" sexual orientation:



45. The image below is a screenshot showing an example of the information that is transmitted to Google through the Google Analytics 4 tracker when the user clicks to view videos relating to the "MILF" category. Google receives information that the user is browsing a page relating to categories featuring "Milf Porn Videos Free Hot Mature Milf Sex Movies," that the user clicked to visit this page from the homepage, and that the user is browsing pornography relating to the "straight" sexual orientation:



```
301    https://analytics.google.com    POST    /g/collect?v=2&tid=G-B39RF

Request
Pretty    Raw    Hex    \n

POST /g/collect?v=2&tid=G-B39RFFWGYY&gtm=
45je48s0v889308053z8892446692za200zb892446692&_p=1725366998185&gcs=G111&gcd=
13t3t3l3l5l1&npa=0&dma=0&tag_exp=0&cid=1318419858.1725366875&ul=en-us&sr=
1728x1117&uaa=arm&uab=64&uafvl=
Not)A%253BBrand%3B99.0.0.0%7CGoogle%2520Chrome%3B127.0.6533.122%7CChromium%3
B127.0.6533.122&uamb=0&uam=&uap=macOS&uapv=14.6.1&uaw=0&are=1&pae=1&frm=0&
pscdl=noapi&_s=1&sid=1725366874&sct=1&seg=1&dl=
https%3A%2F%2Fwww.pornhub.com%2Fvideo%3Fc%3D29&dr=
https%3A%2F%2Fwww.pornhub.com%2F&dt=
Milf%20Porn%20Videos%3A%20Free%20Hot%20Mature%20Milf%20Sex%20Movies%20%7C%20
Pornhub&en=page_view&ep.login_user=No&ep.user_interface=pc&ep.content_group=
categories&ep.content_group_2=category_page&ep.shorties_orientation=straight
&ep.referrer_group=homepage&ep.seo_tags_translation=0&up.login_user=No&
up.user_interface=pc&up.signup_experiment_value=all&up.orientation=straight&
up.shorties_experiment_version=phase_1&up.shorties_exp_2=B&
up.shorties_orientation=straight&up.isp=Packethub&up.connection_type=
Corporate&up.seo_tags_translation_user=0&tfd=9680 HTTP/2
Host: analytics.google.com
Cookie: __Secure-3PSID=
g.a000nAjVoVysd81JfgXw4f24vfEcIUvip35fChit_ZnfAj8uATu5poKdAaiIreT9eGNvi0FLkg
ACgYKAeoSAQ8SFQHGX2Mi1ue6zRc6Fhn9lGwFioavsRoVAUF8yKoIOGAHrYs1q9-xJpI2W4sP007
6; __Secure-3PAPISID=6rz7ZKjsJ0fR1I2e/Az1F2ZKXUcUKzCw2p; __Secure-3PSIDTS=
sidts-CjIBUFGoh4isSqtBsbY1qe1sOcDSQuD2-JalsM9TfRff9-b6wtlY5bVLObtptfnQ03KOPh
AA; NID=
```

46. The image below is a screenshot showing an example of the information that is transmitted to Google through the Google Analytics 4 tracker when a particular video is viewed on Pornhub. The information includes the highly

explicit name of the video, the fact that the video is directed towards a "Straight" sexual orientation, features a "Transgender" segmentation, that the video is "Homemade," features an "Amateur Model," that the video was uploaded by "joraandkonny," that the video is not from Japan, the date the video was published




(2024/03/11), its duration of 12 minutes, and that the English language is spoken in the video.

47. The image below is a screenshot showing an example of the information that is transmitted to Google through the Google Analytics 4 tracker when a user enters a search term in the search bar. The information includes the fact

the user was conducting a video search, the search terms (here, "young black teens"), the fact that a warning was displayed (even though the user here clicked to ignore the warning and view the search results), and the fact that the user was searching for pornography relating to the "straight" sexual orientation:




48. The first image below is a screenshot showing what a Pornhub user sees when they view their cart having clicked to purchase a "Turbo G-Spot Vibe" sex toy, for the price of $40.00. The second image is a screenshot showing the information that is transmitted to Google through the Google Analytics 4 tracker when a user takes this action. It includes the name of the product ("Turbo G-Spot Vibe"), the fact that the user clicked "add to cart" on the product, and the value (or price) of the product.

//

//

//

//

//







49. Each of the event transmissions also include information about the user's browser, such as the language setting, the type of browser and the device and operating system on which the browser is running. It can even collect and record the "traffic source," which is what brought the user to the site in the first place, such as a search engine, an advertisement on which the user clicked, or an email marketing campaign.[2]

---

[2] *How Google Analytics Works*, Google Analytics Help, https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=12156336,1

50. When a user accesses Pornhub while logged into a Google Chrome browser or signed into their Google Account (such as Gmail or YouTube), Google assigns unique identifiers to that session through third-party cookies including 3PSID, 3PAPISID, and 3PSIDCC. These cookies are set by Google services (such as google.com) and are explicitly tied to the user's logged-in Google account. The values of these cookies are unique to each account holder and persist across sessions and devices as long as the user remains signed in.

51. When creating a Google account, users are required to provide an email address, meaning that data collected alongside the 3PSID, 3PAPISID, and 3PSIDCC cookies cookies (such as Pornhub video selections, search terms, and orientation-based category navigation) can be linked by Google to an identifiable email address. Many users, however, also voluntarily provide additional identifying information to Google such as their full name, phone number, home address, work address, profile photograph, and recovery email – either during account creation or while using other Google services. As a result, Google can associate the data collected alongside the cookies not only with an email address, but with a named and potentially highly personalized user profile. This enables Google to link a user's private activity on Pornhub to their name and broader aspects of their digital identity, particularly when combined with other data collected across Google's ecosystem, such as Gmail usage, YouTube views, or Google Maps history.

52. For users who are not signed into a Google account, Google sets a different type of cookie, known as the NID cookie. The NID cookie is tied to the user's browser rather than to a named account. It still contains a unique identifier that persists for approximately 6 months, unless a user manually "clears" their cookies (upon which Google will automatically generate a new, unique identifier

---

2153943,2986333,&sjid=4784303515805700002-NA&visit_id=638186454308763581-3109655727&rd=1 (last visited May 30, 2025).

associated with the NID cookie.) The NID cookie enables Google to track user preferences, browsing behavior, and ad interactions across websites that use Google Analytics or serve Google Ads. While the NID cookie does not reveal a named account identity, it still allows Google to build behavioral profiles and serve personalized advertisements based on a user's activity, including activity on Pornhub. Google's Privacy Policy, expressly acknowledges its practice of tracking users, even when they are not logged in, via sites that have installed Google Analytics 4. Per Google's own statement: "[w]hen you're not signed in to a Google Account, we store the information we collect with unique identifiers tied to the browser, application, or device you're using. This allows us to do things like maintain your preferences across browsing sessions, such as your preferred language or whether to show you more relevant search results or ads based on your activity."[3]

53. In both scenarios, whether the user is signed in or not, Google receives highly sensitive data from Pornhub and links that data to persistent identifiers, either account-based or browser-based. As a result, the information Aylo facilitates Google in collecting can be used to construct detailed, individualized profiles of users' sexual behavior and preferences. These profiles are either directly tied to a real-world identity or are associated with a stable device or browser fingerprint capable of long-term behavioral tracking.

54. Once Google intercepts and processes the raw user data about "events," which may include personal and sensitive health-related information, it uses the Cookies to associate this data with unique user identifiers, from which it can link website interactions to individual user profiles and track users across multiple different Websites, sessions, and devices when signed into their Google accounts. After the data has been processed and subsequently stored in the Google database,

[3] *See* https://policies.google.com/privacy/embedded?hl=en-US (Last accessed May 22, 2025).

Google uses the data to generate reports to help analyze the data intercepted. Those reports include reports on acquisition (e.g., information about where the traffic originated and the methods by which users arrived at a site), engagement (what web pages a user visited), and demographics (a user's age, location, language, gender, and interests expressed when browsing online and engaging in purchase activities).

55. Importantly, Google Analytics 4 offers a "non-personalized ads" feature, which allows websites to use general data and site context for ad targeting, instead of individual user information. However, Aylo has chosen not to enable this option on the Pornhub Website. In Pornhub's case, the "npa" (non-personalized ads) field is set to "0," meaning that personalized ads are enabled. Each user interaction on the site is recorded as an "event." When the "npa" value is set to "1," the data can only be used for internal purposes and cannot be shared with Google Ads for targeting. Because Aylo set the "npa" value for Pornhub to "0," all intercepted user communications from Pornhub can be used for personalized advertising purposes. On information and belief, this choice represents an active decision by Aylo to maximize the commercial exploitation of users' private communications data.

56. The image below is a screenshot of the technical settings relating to the Google Analytics 4 tracker that Aylo has installed on the Pornhub homepage, showing that the "npa" value is set to "0."

//

//

//

//

//

//

//

//

//




57. Accordingly, Aylo has not only failed to disable the personalized ad function, but enables the profiling of users based on their most private sexual preferences and behaviors. The user data collected is transmitted to Google for both analytics and advertising purposes. Once received, Google uses the data to generate reports for Aylo (such as user acquisition reports, engagement metrics, and demographics), and to augment its own commercial datasets. These may include data on user age, language, gender, browsing interests, and geographic location.

58. The information Aylo allows to be disclosed to Google, through its tracking platforms, can be used to identify a specific user, record and redirect their communications containing PII and sensitive information about sexual preferences, and then monetize that information in the form of advertising.

59. Google uses all the information it collects through Google Analytics and integrates it with Google Ads, allowing Google to utilize, and improve, targeted advertising. Then, by tracking user behavior across different websites, Google can improve its targeted advertising, leading to higher click-through rates and, thus, more ad revenue.

60. Aylo also directly benefits from sharing users' private information. Because Aylo shares with Google, Google allows Defendants to improve their marketing, by

permitting them to track Pornhub visitors when they go to other websites, at which time Aylo can send direct, targeted ads.

*ii. The Adtng Tracker*

61. One of these trackers is the Adtng tracker, which transmits to the domain adtng.com, which is primarily associated with adult advertising networks. Aylo has embedded the JavaScript code associated with Atdng tracker into the Pornhub Website in order to monitor user behavior and deliver targeted advertisements, especially in the context of sexually explicit content.

62. When users access Pornhub, the Adtng tracker executes automatically and invisibly in the user' browser. It intercepts user communications with the Pornhub Website in real time, collecting, reading, and analyzing the user's communications with Pornhub in real time and while in transit with Pornhub for its advertising and analytics purposes. The data transmitted to Adtng includes not just general categories of content but highly specific and explicit details about the videos users view. For example, and as shown in the image below, when a user clicks to watch a video entitled "You Sure There's Nothing Else I Can Help You Service?" on the Pornhub site, Adtng transmitted, at the moment the video was selected, approximately 23 different descriptive keywords to its servers. The image below is a screenshot showing the keywords transmitted to Adtng by the tracker. The keywords include technical details (e.g., "HD porn"), the sexual orientation the video is intended for ("gay"), scenario descriptors of the video (e.g., "reality," "handyman"), the names of the performers in the video, physical attributes of the performers (e.g., "hairy chest," "uncut"), and highly explicit descriptions of the actions in the video (e.g., "deepthroat," "handjob"). This level of detail effectively creates a comprehensive profile of the user's exact sexual interests and preferences, far beyond what users would reasonably expect to be shared with third parties.




63. All of this video information is collected, read and analyzed in tandem with other device and session specific information, including browser and device details, and cookies that the Adtng tracker sets on the user's device. The Adtng tracker uses these cookies to create persistent identifiers that can associate browsing sessions across multiple visits to Pornhub.

64. Adtng's use of cookies—alongside the capture of browser and device characteristics—enables it to associate browsing sessions with a persistent identifier. This allows Adtng to track users across different sessions, linking different browsing sessions to the same user profile. Through this mechanism, Adtng is capable of creating a comprehensive, longitudinal profile of a user's Pornhub viewing habits over time.

65. Furthermore, because Adtng's tracking script may be deployed across other websites—including other adult platforms—it is able to associate and combine data collected from Pornhub with information from those sites. This cross-site tracking allows Adtng to build comprehensive behavioral profiles tied to specific

devices and cookies.

66. The data collected by Adtng constitutes personally identifiable information, as it uniquely identifies individual browsers and facilitates persistent tracking of their users across sessions and websites through cookie-based identifiers.

67. On information and belief, Aylo has installed the Adtng Tracker on its website to enhance its marketing and advertising capabilities. By collecting detailed information about the users' interactions with the Pornhub website and the videos they watch, alongside tracking them through unique identifier cookies, Adtng can target these users with advertisements when they access other websites (including pornographic websites) that feature the Adtng tracker

68. On information and belief, Aylo also receives analytics or segmentation insights from Adtng's platform, including behavioral breakdowns of users' preferences. These insights may be used to optimize Aylo's ad placement strategies—such as targeting users with advertisements aligned to their prior Pornhub viewing preferences. On information and belief, the operator of the Adtng tracker also receives similar benefits and insights.

69. In prioritizing its commercial interests over user privacy, Aylo has knowingly facilitated the unauthorized transmission of deeply sensitive and identifying information to third-party advertising entities.

*iii. The Etahub Tracker*

70. Another third-party tracker embedded on Pornhub is the Etahub tracker, which transmits to the domain etahub.com, a domain primarily associated with adult advertising and behavioral tracking. Like the Adtng tracker, the Etahub tracker is tailored to monitor interactions with sexually explicit content and facilitate targeted advertising based on user engagement.

71. Aylo has embedded the JavaScript code associated with the Etahub tracker into the Pornhub Website. When users access Pornhub, Etahub's tracking script executes automatically and invisibly within the user's browser. It intercepts

user communications with the Pornhub Website in real time—reading, analyzing, and transmitting the contents of those communications while they are in transit to and from Pornhub's servers.

72. When users access Pornhub, the Etahub tracker executes automatically and invisibly in the user's browser. It intercepts user communications with the Pornhub Website in real time, collecting, reading, and analyzing the user's communications with Pornhub in real time and while in transit with Pornhub for its advertising and analytics purposes. The data transmitted to Etahub includes not just general categories of content but highly specific and explicit details about the videos users view. For example, as shown in the image below, when a user clicks to watch a video on Pornhub entitled "stepmother," Etahub transmitted, at the moment the video was selected, approximately 25 different descriptive keywords to its servers. The image below is a screenshot showing the keywords transmitted to Etahub by the tracker. The keywords include technical details (e.g., 60fps, HD), categories (e.g., "milf," "stepson"), physical attributes of the female performer in the video (e.g., "big booty"), and highly explicit scene descriptions (e.g., "POV oral," "doggy style," and "bikini sex"). This level of detail effectively creates a comprehensive profile of the user's exact sexual interests and preferences, far beyond what users would reasonably expect to be shared with third parties.

//

//

//

//

//

//

//

//

//




73. In addition to this video-specific data, Etahub captures a range of device-specific information that can create a device profile, including browser types, operating systems, and device characteristics. The combination of these technical identifiers creates a form of "browser fingerprint" that can be used to recognize returning visitors to Pornhub and potentially across other websites where the Etahub tracker is present.

74. Etahub's data collection practices are not confined to Pornhub alone. Because the Etahub tracking script may be embedded on other websites—particularly other adult platforms—it can combine data collected from Pornhub with additional information gleaned from users' visits to other websites. This enables cross-site tracking, allowing Etahub to build sophisticated behavioral profiles tied to particular devices, even without cookie-based identifiers.

75. The data collected by Etahub constitutes personally identifiable information because it uniquely identifies user browsers and enables persistent behavioral tracking over time. Its ability to track users based on the combination of device-level signals significantly enhances the granularity of its profiling.

76. On information and belief, Aylo has deployed the Etahub tracker to enhance its own advertising and marketing capabilities. By transmitting sensitive user interaction data—alongside technical identifiers—to Etahub, Aylo facilitates the segmentation and retargeting of Pornhub users through external ad networks.

77. On further information and belief, Aylo receives analytic or strategic insights from Etahub, including behavioral data that can be used to refine Aylo's advertising tactics. For example, Aylo may use such insights to identify clusters of users with similar viewing preferences and target those users with tailored advertisements based on previously viewed content categories. On information and belief, the operator of the Etahub tracker also receives similar benefits and insights.

78. Through the deployment of the Etahub tracker, Aylo has prioritized its commercial objectives over the privacy of its users, knowingly enabling the unauthorized interception and disclosure of deeply personal and identifying information to a third-party tracker designed specifically for the adult advertising ecosystem.

*iv. Other Third-Party, Pornography-Related Trackers*

79. In addition to Adtng, Etahub and Google Analytics, Aylo has enabled the interception of highly specific user information on Pornhub by other pornographic websites, including through trackers associated with camschat.net, an online sexual chat platform, and hotfree123.com, a video content site. These trackers are associated with adult entertainment ecosystems and appear to receive detailed telemetry related to user behavior on Pornhub.

80. When a user watches a video on Pornhub, third-party trackers are initiated in the background that transmit video-specific metadata to these external sites. The detailed information that these sites collect, read and analyze may include keyword details about the pornographic videos viewed (such as resolution or video format), categorical information about the videos (e.g., "MILF," "taboo," "amateur"), and scene descriptions about the videos (e.g., "POV oral,"

"doggy style").

81. The image below is a screenshot showing the information that is transmitted to camschat.net when a user watches a video on the Website.




82. The image below is a screenshot showing some of the information that is transmitted to hotfree123.com when a user watches a different video on the Website.



83. These transmissions occur in real time as the user interacts with the site. Although these third parties may not receive cookie-based identifiers, they do receive browser-level information as part of the communication exchange. This includes browser type, language setting, user agent string, and in some instances, referrer URLs—all of which can be used for fingerprinting techniques that help track or group user activity.

84. This cross-platform sharing of sensitive information serves several commercial purposes. First, it facilitates content recommendation and ad placement across affiliated adult platforms. Second, it enables these third-party sites to build intelligence about viewing preferences and popular content categories. Third, it creates a network effect where a user's activity on Pornhub may influence the content or advertisements they are shown on these other platforms, should they visit them.

85. Even without traditional personally identifiable information such as IP addresses or cookies, the combination of detailed browser information with specific viewing histories creates a form of "behavioral fingerprinting" that can be used to recognize returning visitors across platforms. This enables Aylo and its network of affiliated adult sites to develop increasingly sophisticated profiles of user preferences and behaviors within the adult content ecosystem.

### C. Plaintiffs And Class Members Did Not Consent To Defendants' Disclosure Of Their Private Information And Confidential Communications

86. At no point did Plaintiffs or Class Members consent to Aylo's disclosure of their private information or electronic communications with Pornhub to third parties, including but not limited to Google, Adtng, Etahub, and other adult content tracking platforms.

87. Pornhub users are not required to create an account in order to access the Website or view video content on it, including pornographic video content.

Pornhub users who browse the site without creating an account are not presented with any clear or conspicuous notice that their viewing behavior, search terms, video selections, sexual orientation categories, or device identifiers will be shared with external analytics or ad tracking services. Nor are they required to affirmatively accept any privacy policy or terms of use before accessing the site.

88. Although Pornhub does have a Privacy Policy containing some disclosures about how users' communications are shared or intercepted by Trackers, that policy can be viewed only after scrolling through all the Website content to the very bottom of the webpage, long after the Trackers have been installed on users' browsers. The hyperlink to access the Privacy Policy is listed in small text among numerous other links at the bottom of the page. The Privacy Policy is never affirmatively agreed to by users who have not registered for a Pornhub account, such as a "Pornhub Premium" account. There are no pop-ups, banners, or interstitial pages that prompt unregistered users to review or accept the Privacy Policy before accessing content on the Website.

89. Aylo's failure to obtain meaningful consent from unregistered Pornhub users is particularly egregious given the highly sensitive and private nature of user communications on Pornhub. Information about an individual's sexual preferences, orientation, and viewing habits is among the most intimate and personal data that exists. Such information is fundamentally different from general browsing data or purchase history, and requires a higher standard of notice and explicit consent before it can be lawfully intercepted and disclosed to third parties.

### D. Plaintiffs and Class Members Have A Reasonable Expectation Of Privacy In Their User Data.

90. Plaintiffs and Class Members have a reasonable expectation of privacy in their user data—particularly the types of data that Aylo orchestrates disclosure of through the Trackers it installs on the Pornhub Website. The expectation of privacy takes on heightened significance when it comes to online pornography consumption,

representing some of the most intimate and personal data that can be collected about an individual. Sexual preferences and interests are fundamentally individualized expressions of a person's identity, reflecting deeply personal aspects of one's psychology and self-conception. Unlike many other online activities, viewing pornography involves engaging with content that reflects one's most private desires, often including aspects of sexuality that individuals may not express in their public or even with their intimate partners.

91. The digital era has transformed how people explore these individualized sexual preferences. Unlike the pre-internet era, when accessing adult content was mostly limited to physical media like magazines or DVDs that could be privately purchased and consumed without tracking, today's online pornography ecosystem enables the precise documentation of a user's sexual interests through their viewing patterns, search queries, and content selections. The internet's vast array of adult content—categorized by countless specific attributes, acts, body types, performers, scenarios, and orientations—allows users to discover and engage with material that precisely aligns with their unique sexual preferences in ways never before possible.

92. This individualization of pornography consumption creates digital footprints that are exceptionally revealing and intimate. When a person repeatedly searches for or views specific categories, scenarios, or attributes within pornographic content, these patterns can reveal highly personal information about their sexual preferences, fantasies, desires, and potentially even their sexual orientation or gender identity. For example, a Pornhub user's regular viewing of videos featuring homosexual pornography may make it possible to draw inferences (although inconclusively) about that user's sexual orientation. And a Pornhub user's consistent viewing of specific gender combinations, power dynamics, or physical attributes in pornographic content creates a detailed profile of their sexual psyche, information so private that many individuals do not share it even with partners or spouses.

93. The intensely personal nature of pornography consumption and these

individualized preferences is demonstrated by the fact that many users take affirmative steps to preserve their anonymity, such as using "private browsing" or "incognito" browsing modes or clearing their browser history when accessing pornographic websites. But those protective measures are ineffective against the technologies Aylo has implemented. Trackers embedded in the Pornhub Website can operate regardless of whether a user is in private mode, collecting and transmitting the highly sensitive data along with browser details, and persistent identifiers such as the NID cookie to third parties in real time. The result is a profound violation of privacy: even users who took specific steps to protect the confidentiality of their most intimate preferences still had their individualized sexual interests intercepted and disclosed to third parties without their knowledge or consent.

94. The average unregistered Pornhub user would have no reason to suspect that their interactions with the Website would trigger the activation of multiple third-party trackers that intercept and transmit detailed information about their viewing habits, search terms, and engagement with specific categories of sexual content. Nothing about the design or operation of the Pornhub Website would lead an unregistered user to expect that (1) Their search for specific categories of adult or pornographic content would be transmitted to the owners of the Trackers (such as Google) in real-time; (2) A profile of their sexual interests would be developed using persistent identifiers that could be linked to their identity; (3) Their browsing of specific sexual orientation categories would be tracked and shared with adult advertising networks; (4) Their viewing of specific video content would be transmitted to third parties along with detailed categorization and scene descriptions; or (5) Their browser and device information would be captured alongside this sensitive content information, allowing for potential re-identification across multiple websites.

95. Privacy studies, such as those by *Pew Research Center*, show that a

majority of Americans are concerned about how data is collected about them.[4] Those privacy polls also reflect that Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares data regarding that customer or other individual.

96. Indeed, according to *Consumer Reports*, more than 90% of Americans believe that more should be done to ensure that companies protect consumers' privacy. Further, 64% of Americans believe that companies should be prohibited from sharing data with third parties, while 63% of Americans want a federal law requiring companies to get a consumer's permission before sharing the consumers' information. To that end, 60% of Americans believe that companies should be required to be more transparent about their privacy policies so that consumers can make more informed choices.[5]

97. Users act in a manner that is consistent with those preferences. During a rollout of new iPhone operating software, for example, 94% of U.S. users who were asked for clear, affirmative consent before allowing companies to track them chose ***not*** to share their data.[6]

98. Due to the highly intimate and sensitive nature of the information users input onto and share on the Pornhub Website, Plaintiffs and Class Members who used the Website reasonably believed and believe that their interactions and private

---

[4] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/

[5] Benjamin Moskowitz et al., *Privacy Front & Center: Meeting the Commercial Opportunity to Support Consumer Rights*, Consumer Reports in collaboration with Omidyar Network (Fall 2020), https://thedigitalstandard.org/downloads/CR_PrivacyFrontAndCenter_102020_vf.pdf

[6] See https://www.wired.co.uk/article/apple-ios14-facebook ("According to Flurry Analytics, 85 per cent of worldwide users clicked 'ask app not to track' when prompted, with the proportion rising to 94 per cent in the US.").

communications with Pornhub were and are confidential and would not be recorded, transmitted to third parties, or monitored for later use. Defendants' unauthorized disclosure of highly personal information and owners of the Trackers' surreptitious interception, storage, and use of Plaintiffs' and Class Members' private medical information violate Plaintiffs' and Class Members' privacy interests and rights.

## PLAINTIFFS' EXPERIENCES

99. Plaintiff Scott Adair has visited the Pornhub Website on a regular basis for the last several years. Plaintiff Adair typically access the Pornhub Website via the Google Chrome browser on his laptop computer in or near his home in Oxnard, CA.

100. Plaintiff Kent Henderson has visited the Pornhub Website on a regular basis for the last several years. Plaintiff Henderson typically access the Pornhub Website via the Google Chrome browser on his Samsung Galaxy mobile device in or near his home in Redondo Beach, CA.

101. Plaintiff Tarris Wallace has visited the Pornhub Website on a regular basis for the last several years. Plaintiff Wallace typically access the Pornhub Website via the Google Chrome browser on his laptop computer and Motorola smartphone in or near his home in Fairfield, CA.

102. Neither Plaintiff Adair nor Plaintiff Henderson utilized "incognito" mode on their Google Chrome browsers while visiting the Website. Plaintiff Wallace occasionally utilized "incognito" mode on his Google Chrome browser when visiting the Website, and other times he did not.

103. During the period they were visiting the Website, Plaintiffs' Google accounts contained their personal identifying information including, *inter alia*, first and last name, date of birth, email address, telephone number, and physical address.

## CLASS ACTION ALLEGATIONS

104. Plaintiffs bring this action on behalf of themselves, individually, and on behalf of all others similarly situated as a class action on behalf of the following

class (the "Class"):

> All California residents who are not or have never been registered Pornhub account holders, and whose electronic communications with the Pornhub Website were intercepted by Google or other third-party tracking technologies implemented on the Pornhub Website within the applicable statute of limitations.

105. Excluded from the Class are employees of Defendants and employees of Defendants' parents, subsidiaries, and corporate affiliates; any judge to whom this case is assigned; and any jurors assigned to this case. Plaintiffs reserve the right to redefine the Class and/or divide the Classes into subclasses at, or prior to, the class certification stage; in response to discovery or further investigation; or pursuant to instruction by the Court.

**Numerosity**

106. The Class that Plaintiffs seek to represent contains numerous members, estimated to be in the hundreds of thousands, meaning that joinder of all members is impracticable. Given Pornhub's reported 300 million monthly visits in the United States and the frequency of page interactions, Aylo may have facilitated privacy violations against hundreds of thousands or millions of California residents. The Class members are also clearly ascertainable including, without limitation, by using Aylo's records and/or Google's records to determine the size of the Classes and to determine the identities of individual Class members.

**Typicality**

107. Plaintiff's claims are typical of the members of the Classes, as Plaintiffs now suffer and have suffered from the same violations of the law as other putative Class members. Plaintiffs and all members of the Classes visited the Pornhub Website, programmed in the same way by Aylo, and had the same types of sensitive information sent to the owners of the Trackers, including Google, without their consent. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other Class members and are based on the same legal

theories.

**Adequacy**

108. Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained competent counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and their members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests that are adverse to those of the other members of the Class.

**Commonality and Predominance**

109. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Plaintiffs and Class members had a reasonable expectation of privacy in the contents of their communications with the Pornhub Website;

(b) Whether Aylo implemented the Trackers on its Pornhub Website;

(c) Whether Aylo aided, abetted or procured the interception and disclosure of Plaintiffs' and Class member's communications with the Pornhub by installing or embedding the Trackers on its Website;

(d) Whether Aylo's aiding, abetting or procuring of the interception and disclosure of Plaintiffs' and Class member's communications with the Pornhub by installing the Trackers on its Website was highly offensive;

(e) Whether the Trackers' interception of Website users' communications with Pornhub occurred as the communications were taking place;

(f) Whether Aylo intruded upon Plaintiffs' and Class member's seclusion by embedding the Trackers on the Website and sharing Plaintiff's communications without their consent;

(g) Whether Aylo violated Plaintiffs' and Class member's privacy rights, including those arising under the California Constitution;

(h) Whether Aylo's acts and practices violate or violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.;

(i) Whether Plaintiffs and Class members are entitled to injunctive and equitable relief; and

(j) Whether Plaintiffs and Class members are entitled to actual, statutory, nominal, and/or other forms of damages and other monetary relief.

**Superiority**

110. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all of the members of the Class is impracticable and because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Even if every individual member of the Class could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if individual litigation of the numerous cases were to be required. Individualized litigation also would present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action with respect to some or all of the issues will present fewer management difficulties, conserve the resources of the court system and the parties, and protect the rights of Members of the Class. Further, it will prevent the very real harm that would be suffered by numerous members of the putative Class who simply will be unable to enforce individual claims of this size on their own. The prosecution of individual actions by members of the Classes also would run the risk of establishing inconsistent standards of conduct for Defendant.

//

## FIRST CAUSE OF ACTION

**Aiding and Abetting Unlawful Interception**
**(Violation of California Penal Code § 631)**
**(Plaintiffs Individually and on Behalf of Class Members)**

111. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

112. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id*. § 630. CIPA is intended "to protect the right of privacy of the people of this state." *Id*.

113. To establish liability under section 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, or contrivance, or in any other manner," did or does any of the following:

> "[i] [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> [ii] [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire,

line or cable or is being sent from or received at any place within this state,

Or

[iii] [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[iv] [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

114. Under § 631, a defendant must show that it had all parties' consent.

115. Defendants are each a "person" for the purposes of CIPA.

116. The Trackers, Plaintiffs' and Class members' web browsers, and Plaintiffs' and Class members' computing and mobile devices are a "machine, instrument, or contrivance…or other manner."

117. At all relevant times, Defendants installed and activated third-party Trackers, including Google Analytics 4 and other third-party tracking technologies, on the Pornhub Website. These Trackers intercepted communications between Plaintiffs (and Class Members) and the Website, without their consent, and while those communications were in transit.

118. By enabling and facilitating these Trackers, Aylo intentionally aided, agreed with, and employed third parties (including Google and the operators of the other third-party Trackers) to willfully intercept, read or attempt to read, and use the contents of users' communications with the Pornhub Website. These communications included highly sensitive data such as users' search queries, video selections, category navigation, and identifiers.

119. These third-party entities used the intercepted communications to enhance their advertising and analytics products, including profiling users, measuring ad effectiveness, and expanding commercial datasets.

120. Plaintiffs and Class Members did not consent to these interceptions. At no time were they notified that their communications—including deeply private details about their sexual interests—would be transmitted to third parties.

121. At all relevant times, Defendants willingly facilitated, aided, employed, agreed with, procured and conspired with unauthorized third parties to track and intercept Plaintiffs' and Class members' personal and private communications made via the Pornhub Website. These communications were transmitted to and intercepted by third parties while the communications were in transit, and were not authorized or consented to by Plaintiffs and Class members. Accordingly, the interception by the Trackers was unlawful and Defendants aided and abetted the third parties' unlawful conduct.

122. Defendants' conduct as described above violated California Penal Code § 631(a). Under Penal Code § 637.2, Plaintiffs and the Class members therefore are entitled to $5,000 in statutory damages per violation, even in the absence of proof of actual damages, the amount deemed proper by the California Legislature.

**SECOND CAUSE OF ACTION**
**Invasion of Privacy**
**(Violation of Art. 1, § 1, California Constitution)**
**(Plaintiffs Individually and on Behalf of the Class Members)**

123. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

124. "Privacy" is listed in Article I, Section 1, of the California Constitution as a fundamental right of all Californians. That section of the Constitution provides: "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life, liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

125. The right to privacy in California's Constitution creates a right of action against private entities such as Defendants. To state a claim for invasion of privacy

under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

126. Plaintiffs and Class members have a legally protected privacy interest in their private and confidential communications with Defendants' Pornhub Website. These communications included data reflecting private sexual interests, orientation, search terms, video titles, scene descriptors and names of actors, and interactions with the site's adult content marketplace. The searching for, selection of, and consumption of online pornography is a highly intimate, private and sensitive personal activity, and any associated data is among the most sensitive personal information. Plaintiffs and Class members have privacy interests in conducting these activities without information about these activities being observed, intruded upon or interfered with by undisclosed third parties.

127. Plaintiffs and Class Members had a reasonable expectation that this data would not be accessed by unknown third parties without consent. That expectation is particularly strong given that unregistered users were not required to affirmatively accept a privacy policy, login, or otherwise manifest consent to third-party surveillance.

128. Defendants' conduct constituted a serious and unjustified intrusion into Plaintiffs' digital privacy. Allowing or procuring the transmission of private and personally identifiable information to third-party ad and analytics entities—including Google and other third-party tracking services—without meaningful notice or consent, and for commercial gain, offends established social norms and expectations.

129. As a direct and proximate result of Defendants' actions, Plaintiffs and Class members have had their privacy invaded and have sustained injury, including loss of control over their personal information.

130. Plaintiffs and Class Members seek appropriate relief for that injury,

including but not limited to restitution, disgorgement of profits earned by Defendants as a result of the intrusions upon Plaintiffs' and Class members' privacy, nominal damages, and any other equitable relief that will properly compensate Plaintiffs and Class members for the harm to their privacy interests.

131. Plaintiffs also seek such other relief as the Court may deem just and proper.

**THIRD CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**(Common Law Invasion of Privacy)**
**(Plaintiffs Individually and on Behalf of the Class Members)**

132. Plaintiffs incorporate each allegation set forth above as if fully set forth herein and further allege as follows.

133. Under California common law, the tort of intrusion upon seclusion is established where a plaintiff can show: (1) an intentional intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

134. Plaintiffs and Class Members had a reasonable expectation that their interactions with the Pornhub Website—including the search terms they entered, the pornographic videos they viewed, the orientation categories they navigated, and their broader behavioral patterns on the site—would remain private and would not be observed, recorded, or disclosed to unknown third parties.

135. The nature of the information disclosed—particularly sexual orientation, sexual preferences, and detailed scene-level metadata associated with adult content—is highly sensitive. These details are deeply personal, and the average person would reasonably expect to maintain control over whether and to whom such information is shared.

136. Defendants knowingly enabled and facilitated the real-time tracking, recording, and interception of Plaintiffs' and Class Members' private interactions

with the Pornhub Website by embedding Trackers operated by third parties, including but not limited to Google. These Trackers recorded Plaintiffs' online behavior on the Website and transmitted the resulting data to third-party servers without Plaintiffs' knowledge or consent.

137. Defendants' actions constituted a clear and intentional intrusion into Plaintiffs' and Class Members' private affairs. The decision to embed and activate these Trackers—without providing conspicuous notice, without requiring affirmative consent, and without offering users any real opportunity to opt out—amounts to an intentional circumvention of Plaintiffs' right to control their own personal information.

138. The intrusion was highly offensive to a reasonable person. The average individual would be deeply disturbed to learn that a pornography website they accessed anonymously had allowed advertising and analytics companies to observe and collect data about their private sexual preferences, behaviors, and expressions—particularly when done without any notice or consent and with the potential for behavioral profiling, cross-site identification, or location-based retargeting.

139. Further, many users took steps to preserve their privacy—such as using private browsing modes or refraining from logging in—demonstrating both their subjective expectations of privacy and the unreasonableness of Defendants' conduct in overriding those expectations.

140. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members suffered injury to their dignity and autonomy. The intrusion into their private digital communications and sexual behavior was substantial and unjustified.

141. Plaintiffs and Class Members seek appropriate relief for this harm, including nominal damages, compensatory damages, restitution, disgorgement of ill-gotten gains, and all other equitable relief the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of themselves and the Classes, pray for the following relief:

(a) An order certifying the Class, appointing Plaintiffs as representatives of the Class, and appointing counsel for Plaintiffs as class counsel;

(b) An order declaring that Defendants' actions, as described above, violate California Penal Code § 631;

(c) An order declaring that Defendants' actions, as described above, violate Art. 1, § 1 of the California Constitution;

(d) An order finding in favor of Plaintiffs and the Class members on all counts;

(e) Statutory damages of $5,000 per violation under California Penal Code § 637.2 to Plaintiffs and each of the members of the Class, and any other damages that the Court deems fair and just, including punitive damages;

(f) An award of compensatory and/or nominal damages to Plaintiffs and each of the members of the Class;

(g) An order of restitution and all other forms of equitable monetary relief;

(h) Pre- and post-judgment interest on all amounts awarded to the extent allowed by law;

(i) An order awarding Plaintiffs and the Class payment of their reasonable attorneys' fees and expenses and costs of the suit; and

(j) Any further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

//

//

//

//

Dated: September 8, 2025

Respectfully submitted,


*/s/ Kolin C. Tang*
James C. Shah (SBN #260435)
Email: jcshah@millershah.com
Kolin C. Tang (SBN #279834)
Email: kctang@millershah.com
**MILLER SHAH LLP**
8730 Wilshire Blvd., Suite 400
Los Angeles, CA 90211
Telephone: (866) 540-5505
Facsimile: (866) 300-7367

Kyle Shamberg (*PHV* application pending)
**Carroll Shamberg LLC**
111 W. Washington Street, Suite 1240
Chicago, IL 60602
kyle@csclassactions.com
(872)215-6205

*Attorneys for Plaintiff and the Putative Class*