UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-06351-WLH-KS | Date | July 17, 2026 |
| Title | ***Scott Adair et al v. Aylo USA Incorporated et al*** | | |

| | |
|---|---|
| Present: The Honorable | WESLEY L. HSU, United States District Judge |

| | |
|---|---|
| Evelyn Chun | None |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff: | Attorneys Present for Defendant: |
| None | None |

**Proceedings: (IN CHAMBERS) ORDER RE DEFENDANTS' MOTION TO COMPEL ARBITRATION [52]**

The Court is in receipt of Defendants' Motion to Compel Arbitration. ("Motion to Compel Arbitration," Dkt. No. 52) ("Mot."). For the reasons explained herein, the Court **DENIES** the Motion.

## I. BACKGROUND

Plaintiffs Scott Adair and Kent Henderson[1] (collectively, "Plaintiffs") brought suit against Defendants Aylo USA Incorporated ("Aylo USA"), Aylo Global Entertainment, Inc. ("Aylo Global"), Aylo Freesites, Ltd. ("Aylo Freesites"), Aylo Holdings S.a.r.l. ("Aylo Holdings") and 9219-1568 Quebec, Inc. ("9219-1568 Quebec") (collectively, "Defendants"). ("First Amended Complaint," Dkt. No. 24) ("Compl."). Plaintiffs brought this action on behalf of themselves, individually, and on behalf of all others similarly situated as a class action related to the following class: "[a]ll California residents who are not or have never been registered Pornhub account holders, and whose electronic communications with the Pornhub Website were intercepted by Google or other third-party tracking technologies implemented on the Pornhub Website within the

[1] This order pertains only to Plaintiffs Adair and Henderson. (Mot. at 6).

applicable statute of limitations." (Compl. ¶¶ 104). Plaintiffs assert the following causes of action: (1) Aiding and Abetting Unlawful Interception pursuant to California Penal Code § 631, (2) Invasion of Privacy and (3) Intrusion Upon Seclusion. (*Id*. ¶ 111-41).

Plaintiffs allege Defendants operated www.pornhub.com ("Pornhub") with embedded third-party tracking technologies that secretly intercepted, disclosed and commercially exploited highly-sensitive information pertaining to Plaintiffs' pornographic viewing, search terms and sexual-orientation-based browsing without meaningful consent. (*See generally Id.*). For example, Plaintiffs allege that Defendants and third-party tracking technologies on their website—including Google Analytics 4, etahub.com, adtng.com, camschat.net and hotfree123.com (the "Trackers") —

> intercept[ed], read[] and analyz[ed] a range of highly sensitive and identifying information, including (1) specific video titles a user has selected and played; (2) any sexual orientation categories navigated (e.g., transgender, gay, bisexual); (3) explicit and detailed scene-specific attributes of the videos (such as the presence of named pornographic performers, the production type like 'amateur,' 'homemade' or "doggy style," or whether the video was made in a specific country such as "Japan"); (4) any search terms entered by the user into the Pornhub Website search bar, including even sensitive queries like "Asian teen girl" or "young black teens"; and (5) details about products viewed or purchased on the Website's online shop, including item categories, names, and price.

(*Id*. ¶ 43).

Plaintiffs also allege, "[w]hen a user watches a video on Pornhub, third-party trackers are initiated in the background that transmit video-specific metadata to these external sites. The detailed information that these sites collect, read and analyze may include keyword details about the pornographic videos viewed (such as resolution or video format), categorical information about the videos (e.g., 'MILF,' 'taboo,' 'amateur.')." (*Id*. ¶ 80).

> Defendants have embedded multiple third-party tracking technologies on their website—including Google Analytics 4, etahub.com, adtng.com, camschat.net and hotfree123.com (collectively, the "Trackers")—that allow

> these third parties to intercept, collect, and exploit users' most private data without knowledge or consent. In doing so, Defendants have transformed private sexual exploration into a source of commercial surveillance and behavioral profiling.

(*Id.* ¶ 1).

Additionally, Plaintiffs allege, "[w]hen a user watches a video on Pornhub, third-party trackers are initiated in the background that transmit video-specific metadata to these external sites. The detailed information that these sites collect, read and analyze may include keyword details about the pornographic videos viewed (such as resolution or video format), categorical information about the videos (e.g., 'MILF,' 'taboo,' 'amateur.')." (*Id.* ¶ 80).

Plaintiffs also aver that the trackers intercept user communications with the Pornhub Website in "real time," collecting and analyzing the user's communications while in transit with Pornhub for its advertising and analytics purposes. (*See id.* ¶ 42) ("Once activated, the Google Analytics 4 tracker intercepts, reads and analyzes various data points about user communications with a website, known as 'events.' These events include page views, links the user has clicked, form submissions, video plays, file downloads, and custom events defined by the website owner. The Google Analytics 4 tracker intercepts these events, transmits them to Google's servers in real time, as they occur."); (*see also id.* ¶¶ 62-63) ("When users access Pornhub, the Adtng tracker executes automatically and invisibly in the user' browser. It intercepts user communications with the Pornhub Website in real time, collecting, reading, and analyzing the user's communications with Pornhub in real time and while in transit with Pornhub for its advertising and analytics purposes. The Adtng tracker uses these cookies to create persistent identifiers that can associate browsing sessions across multiple visits to Pornhub.").

The premise of this dispute is that Plaintiffs could not have consented to the technologies' interception and disclosure of their real-time browsing activity because Plaintiffs are unregistered Website users who neither created accounts nor agreed to the Website's Privacy Policy, Terms of Service and other disclosures. (*Id.* ¶ 4, 88-89, 94, 127).

The Website's Customer Management Service ("CMS"), one of Pornhub's internal records management systems, records certain details on registered user accounts, such as: (i) the email address used to create the account, (ii) the date and time the user created the account, (iii) the username associated with the account, (iv) the last time the user affirmatively authenticated through the Website's login function and (v) certain account transaction history. (Declaration of Ibrahim Sabbagh[2] ("Sabbagh Decl."), Dkt. No. 52-7 ¶ 4). During the relevant period, July 2025, users could create accounts on the Website either by (1) registering with an email address and password or (2) authenticating through a Google single sign-on ("Google SSO"). (*Id.* ¶ 5).

In their verified interrogatory responses served in this litigation, Plaintiff Adair identified his email address as sincereman69@gmail.com and Plaintiff Henderson identified his email address as khardboot@gmail.com. (Plaintiffs' Responses and Objections to First Set of Interrogatories, Dkt. No. 52-3) ("Plaintiffs' Responses and Objections"). The Website's CMS records confirm both addresses were used to create Website user accounts using the Google SSO method, that is, Google account credentials were used to create and verify the accounts. (Sabbagh Decl. ¶¶ 7-8).

Defendants state that Plaintiff Adair's Gmail address was used to create an account on July 5, 2025, at 8:48 p.m. UTC. (*Id.* ¶ 13). The IP address used at registration, 172.115.210.0, according to Defendants, is generally associated with Oxnard, California,

---

[2] Sabbagh is Vice President of Engineering at Defendant 9219-1568 Quebec Inc

which is the location of Plaintiff Adair's home. (*Id.* ¶ 14; Plaintiffs' Responses and Objections at 8). Plaintiff Adair created his account using Google SSO. (Sabbagh Decl. ¶ 17).

Defendants also state Plaintiff Henderson's Gmail address was used to create an account on July 9, 2025, at 10:02 p.m. UTC. (*Id.* ¶ 19). The IP address used at registration, 172.56.55.0, according to Defendants, is generally associated with Beverly Hills, California, which Defendant states is near the location of Mr. Henderson's home in Redondo Beach, California. (*Id.* ¶ 20; Plaintiffs' Responses and Objections at 8). Plaintiff Henderson also created his account using Google SSO. (Sabbagh Decl. ¶ 23).

The sworn declaration also states that the accounts of both Plaintiffs reflect recent activity. Plaintiff Adair's account shows activity as recently as October 20, 2025, more than three months after he created the account. (*Id.* ¶ 30). Plaintiff Adair's account also twice triggered a reset password email on March 17, 2026. (*Id.* ¶ 31). This is the same date that Defendants' counsel informed Plaintiffs that Plaintiff Adair had created an account on the Website. (Declaration of Christopher Lisy ("Lisy Decl."), Dkt. No. 52-2 ¶ 8). Plaintiff Henderson's account was used to access Website content on February 4, 2026, and February 9, 2026, with his account showing active sessions on the Website as recently as March 18, 2026, from the IP address 104.174.237.24. (Sabbagh Decl. ¶¶ 32, 33, 35-36). Plaintiff Henderson's account also triggered a reset password email on March 17, 2026 (*id.* ¶ 34), which is the same date that counsel for Defendants informed Plaintiffs' counsel that Mr. Henderson had created an account on the Website. (Lisy Decl. ¶ 8).

Plaintiffs each submitted identical declarations to challenge Defendants' account creation evidence. (Declaration of Scott Adair ("Adair Decl."), Dkt. No. 60-1 ¶ 4; Declaration of Kent Henderson ("Henderson Decl."), Dkt. No. 60-3 ¶ 4). Each Plaintiff

declares, "[a]t no time from then until the present have I ever intended to, desired, or taken any deliberate action to create an account on Pornhub." (Adair Decl. ¶ 3; Henderson Decl. ¶ 3). Each Plaintiff also declares "it has been my intention and desire to browse the website anonymously without registering for any account associated with Pornhub." (Adair Decl. ¶ 4; Henderson Decl. ¶ 4). Each declaration stated that the declarant had "no recollection of having ever seen these pages or of singing up for any account by entering an information or clicking on any buttons displayed in these screenshots." (Adair Decl. ¶ 6; Henderson Decl. ¶ 6). Each Plaintiff also provides screenshots pertaining to his respective Google account (Exh. 1 to the Adair Decl., Dkt. No. 60-2; Exh. 1 to the Henderson Decl., Dkt. No. 60-3), which reflects that "neither www.pornhub.com nor any related site are listed among the websites and applications for which I've used Google Singe-Sign on" (Adair Decl. ¶¶ 7-8; Henderson Decl. ¶¶ 7-8).

With respect to the methods of account creation on the Website, when users created their accounts, they are presented with a sign-up window requiring their agreement to the Website's Terms and Conditions. (Exhibit 2, Dkt. No. 54-1; Exhibit 3, Dkt. No. 54-2). The window displayed appears as follows:



The sign-up window is displayed with a black background, greying out the website detail behind it. (*Id*). Plaintiffs created their accounts by clicking the "Sign up with Google" button. (Sabbagh Decl. ¶¶ 17, 23). Below the button, in contrasting white text against a black background, the Website notified the Plaintiffs: "By signing up, you agree to our Terms and Conditions." (Exhibit 2 at 1; Exhibit 3 at 1). The "Terms and Conditions" hyperlink, displayed in contrasting orange font, directed the user to the Website's Terms of Service. (*Id*.).

The Terms of Service contain the following arbitration agreement

> [Y]ou and we agree that we will resolve any disputes between us (including any disputes between you and a third-party agent of ours) through binding and final arbitration instead of through court proceedings . . . . All controversies, claims, counterclaims, or other disputes arising between you and us or you and a third-party agent of ours (each a "Claim") shall be submitted for binding arbitration in accordance with the Rules of the American Arbitration Association ("AAA Rules").
>
> The Federal Arbitration Act and federal arbitration law apply to this agreement. However, the Arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of these Terms of Service including, but not limited to, a claim that all or any part of these Terms of Service is void or voidable.
>
> Neither you nor we may act as a class representative or private attorney general, nor participate as a member of a class of claimants, with respect to any Claim. Claims may not be arbitrated on a class or representative basis. The arbitrator can decide only your and/or our individual Claims. The arbitrator may not consolidate or join the claims of other persons or parties who may be similarly situated.
>
> THIS SECTION LIMITS CERTAIN RIGHTS, INCLUDING THE RIGHT TO MAINTAIN A COURT ACTION, THE RIGHT TO A JURY TRIAL, THE RIGHT TO PARTICIPATE IN ANY FORM OF CLASS OR REPRESENTATIVE CLAIM, THE RIGHT TO ENGAGE IN DISCOVERY EXCEPT AS PROVIDED IN AAA RULES, AND THE RIGHT TO CERTAIN REMEDIES AND FORMS OF RELIEF. OTHER RIGHTS THAT YOU OR WE WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

(Arbitration Agreement, Dkt. No. 52-6, Ex. 4).

Defendants filed the instant Motion. (*See generally* Mot.). Plaintiffs filed their Opposition (Opp'n Dkt. No. 60), to which Defendants timely replied (Reply, Dkt. No. 64).

## II. DISCUSSION

### A. Legal Standard

The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, S. Ct. 1740, 1742 (2011) (cleaned up). As with any contract, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147-48 (2024) (quoting 9 U.S.C. § 2). When evaluating a motion to compel arbitration, a district court must therefore determine what the parties have consented to arbitrate, *id.* at 148, and order parties to proceed to arbitration on any issues which they have validly agreed to arbitrate. 9 U.S.C. § 4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 213 (1985).

The FAA allows "parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). Any such agreement "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010). When an arbitration agreement contains a provision delegating to the arbitrator the power to resolve arbitrability question, the Court's inquiry is thereby limited to asking whether the parties validly consented to the delegation provision. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S.

938, 943 (1995) ("[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter."). A party opposing arbitration must specifically challenge a delegation provision. *Rent-A-Center*, 561 U.S. at 72. If the party fails to do so, a Court must treat the provision as valid, order arbitration and leave "any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.*

**B. <u>Analysis</u>**

Defendants move to compel arbitration asserting the Agreement's validity and that Plaintiffs agreed to arbitrate "any disputes" arising from their use of the Website. (Mot. at 11).

The FAA provides that "an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. A party moving to compel arbitration under the FAA need only demonstrate by a preponderance of the evidence "(1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

Under the FAA, courts are limited "'to deciding whether: (1) a valid agreement to arbitrate exists between the parties and (2) the scope of the agreement encompasses the claims.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024) (quoting *Chiron Corp. v. Ortho Diagnostic Sys.*, Inc., 207 F.3d 1126, 1130 (9th Cir. 2000)). "When the parties have 'clearly and unmistakably' delegated questions regarding arbitrability to the arbitrator, the court need not conduct further inquiries beyond the existence of the arbitration agreement." *Fli-Lo Falcon, LLC,* 97 F.4th at 1194. Federal

courts apply state law to determine whether a valid arbitration agreement exists. *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 476 (9th Cir. 2024).[3]

"If the court is 'satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.'" *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021) (quoting 9 U.S.C. § 4). But "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id*. "When considering a motion to compel arbitration, a court applies a standard similar to the summary judgment standard of [Federal Rule of Civil Procedure] 56." *Tabas v. MoviePass, Inc*., 401 F. Supp. 3d 928, 936 (N.D. Cal. 2019) (quoting *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 804 (N.D. Cal. 2004)). "The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Hansen,* 1 F.4th at 670.

Here, applying this standard, the Court finds that a trial on this issue is required. Under California law, sign-in wrap agreements, including agreements to arbitrate, like the one at issue here, are enforceable when the website "provides 'reasonably conspicuous notice of the terms to which the consumer will be bound' and some action is taken by the consumer 'such as clicking a button or checking a box' which 'unambiguously manifests' agreement to the terms of the contract." *Huynh v. Boom Shakalaka, Inc*., 814 F. Supp.3d 1141, 1149 (C.D. Cal. 2026) (quoting *Keebaugh v. Warner Bros. Ent., Inc*., 100 F.4th 1005, 1014 (9th Cir. 2024)); *Callaway v. Anheuser-Busch Companies*, LLC, No. CV 24-704-JFW(PVCX), 2024 WL 1260806, at *4 (C.D. Cal. Mar. 18, 2024) (same). Absent

[3] Here, because both Plaintiffs are California residents, California law applies.

actual notice, a website owner can demonstrate constructive notice by showing that: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

In *Huynh*, the plaintiff created an account on the relevant website. 814 F. Supp.3d at 1144. Through a declaration, the plaintiff, who stated he created the account, indicated that he did not see or agree to the Terms of Service and neither clicked the "Terms of Service" hyperlink nor was presented with the Terms for use of the App. *Id*. at 1148. The court found that the defendant's sign up and login screen provided "reasonable conspicuous notice," and that the plaintiff "unambiguously manifested his assent to the Terms." *Id*. at 1149. The court reasoned that the relevant hyperlink "is readily apparent as it is underlined, the same color as other clickable aspects, and is set off with sufficient empty space around it to stand out." *Id*. "In addition, it is displayed directly below the login button by which the Terms are accepted. Indeed, upon signing up or logging in, the App notifies users that '[b]y signing up or logging in, you agree to our Terms of Service and Privacy Policy.'" *Id*.

The facts of *Huynh* provide guidance in determining the merits of this Motion. Defendants contend that Plaintiffs received conspicuous notice of the terms to which they would be bound and manifested intent to accept those terms by clicking the "Sign up with Google" button (or for that matter if they had signed up using an email account). Here, Defendants attempt to establish, through sworn declaration, that Plaintiffs created Website user accounts using Google SSO, that is, Google account credentials were used to create and verify the accounts. (Sabbagh Decl. ¶¶ 7-8). Specifically, Defendants aver that the Website's CMS records confirm both addresses were used to create Website user

accounts using the Google SSO method, that is, Google account credentials were used to create and verify the accounts. (Sabbagh Decl. ¶¶ 7-8). Specifically, Defendant has submitted testimony and documentary evidence that Plaintiff Adair's Gmail address was used to create an account on July 5, 2025, at 8:48 p.m. UTC. (*Id*. ¶ 13). The IP address used at registration, 172.115.210.0, according to Defendants, is generally associated with Oxnard, California, which is the location of Plaintiff Adair's home. (*Id*. ¶ 14; Plaintiffs' Responses and Objections at 8). Plaintiff Adair created his account using Google SSO. (Sabbagh Decl. ¶ 17).

Defendants also submitted evidence that Plaintiff Henderson's Gmail address was used to create an account on July 9, 2025, at 10:02 p.m. UTC. (*Id*. ¶ 19). The IP address used at registration, 172.56.55.0, according to Defendants, is generally associated with Beverly Hills, California, which is near the location of Mr. Henderson's home in Redondo Beach, California. (*Id*. ¶ 20; Plaintiffs' Responses and Objections at 8). Plaintiff Henderson also created his account using Google SSO. (Sabbagh Decl. ¶ 23).

Defendants also state that the accounts of both Plaintiffs reflect recent activity. According to Defendants' declaration, Plaintiff Adair's account shows activity as recently as October 20, 2025, more than three months after he created the account. (*Id*. ¶ 30). Plaintiff Adair's account also twice triggered a reset password email on March 17, 2026. (*Id*. ¶ 31). Damningly, this is the same date that Defendants' counsel informed Plaintiffs that Plaintiff Adair had created an account on the Website. (Declaration of Christopher Lisy ("Lisy Decl."), Dkt. No. 52-2 ¶ 8). Plaintiff Henderson's account was used to access Website content on February 4, 2026, and February 9, 2026, with his account showing active sessions on the Website as recently as March 18, 2026, from the IP address 104.174.237.24. (Sabbagh Decl. ¶¶ 32, 33, 35-36). Plaintiff Henderson's account, according to Defendants' evidence, also triggered a reset password email on

March 17, 2026 (*id*. ¶ 34), which is the same date that counsel for Defendants informed Plaintiffs' counsel that Mr. Henderson had created an account on the Website. (Lisy Decl. ¶ 8).

Plaintiffs' challenge to the credibility of the Defendants' evidence, however, creates a genuine despite warranting a trial on this limited issue. First, Plaintiffs argue that the Defendants' evidence lacks credibility because it requires the Court to find that "that Plaintiffs, who have been Pornhub users for many years, both signed up for accounts on Pornhub approximately one month *after* filing a class action lawsuit representing unregistered users of the site and, coincidentally, happened to do so within four days of one another." (Opp'n at 1) (emphasis added).

Second, Plaintiffs each submitted declarations to directly challenge Defendants' account creation evidence. Each Plaintiff declares, "[a]t no time from then until the present have I ever intended to, desired, or taken any deliberate action to create an account on Pornhub." (Adair Decl. ¶ 3; Henderson Decl. ¶ 3). Each Plaintiff also declares "it has been my intention and desire to browse the website anonymously without registering for any account associated with Pornhub." (Declaration of Scott Adair ("Adair Decl."), Dkt. No. 60-1 ¶ 4; Declaration of Kent Henderson ("Henderson Decl."), Dkt. No. 60-3¶ 4). Each declaration stated that the declarant had "no recollection of having ever seen these pages or of singing up for any account by entering an information or clicking on any buttons displayed in these screenshots." (Adair Decl. ¶ 6; Henderson Decl. ¶ 6). Each Plaintiff also provides screenshots pertaining to his respective Google account (Exh. 1 to the Adair Decl., Dkt. No. 60-2; Exh. 1 to the Henderson Decl., Dkt. No. 60-3), which reflects that "neither www.pornhub.com nor any related site are listed among the websites and applications for which I've used Google Singe-Sign on" (Adair Decl. ¶¶ 7-8; Henderson Decl. ¶¶ 7-8).

Notably, Plaintiffs' Opposition fails to address the Defendants' evidence that each of the accounts at issue generated a password-reset attempt on exactly the same day that Defendants' counsel informed Plaintiffs' counsel that these accounts existed (Sabbagh Decl. ¶¶ 31, 34). These password-reset emails, according to Defendants, were sent to Plaintiffs' Gmail account, but Plaintiffs do not address this fact. Plaintiffs do not claim that they searched their email records and have no record of any emails regarding these accounts. It is logical to conclude that Plaintiffs do not address this damning fact because they cannot dispute that they initiated the password-reset attempts. This would in turn further suggest that the accounts exist and were under Plaintiffs' control.

Because of the procedural posture of this matter, however, this Court cannot resolve these credibility disputes. On this record, therefore, the Court cannot conclude that Plaintiffs' evidence is insufficient to raise a genuine dispute of material fact regarding whether Plaintiffs intentionally created the accounts. The facts of this case are distinguishable from *Huynh* where there was no dispute as to whether plaintiff intentionally created the relevant account. 814 F. Supp. 3d at 1144. Plaintiffs' evidence creates a genuine dispute as to whether Plaintiffs knowingly created the two accounts in question.

Thus, the Court finds a trial on this limited issue is necessary to determine this dispute and whether Plaintiffs can be bound by the terms of the arbitration agreement in the "Terms and Conditions" link on the Website.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion is **DENIED**.

The Court **ORDERS** a trial on the narrow question of whether Plaintiffs intentionally created the two accounts in question. The Court will allot each party three hours to present its case at trial.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

The Court further **ORDERS** the parties to meet and confer within 14 days of the entry of this Order regarding a jointly proposed date for trial. The parties are **DIRECTED** to jointly notify the Court, through a filing, of the proposed trial date and any pretrial filing deadlines, within a week of the meet and confer.

**IT IS SO ORDERED.**